UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

- - -

UNITED STATES OF AMERICA,      : CASE NO.
                               : 3:21-CR-061-TMR-1
            Plaintiff,         :
        vs.                    :
                               : SENTENCING
WILLIAM SIDNEY HITCHINGS, V,   :
                               : WEDNESDAY, MARCH 8, 2023
            Defendant.         : 1:30 P.M.
                               :
                               :

- - -

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS M. ROSE,
UNITED STATES DISTRICT JUDGE, PRESIDING

- - -

APPEARANCES:

For the Plaintiff:
                    CHRISTINA MAHY, ESQ.
                    U.S. Attorney's Office
                    200 W. Second Street
                    Suite 600
                    Dayton, OH  45402

For the Defendant:
                    JAMES P. FLEISHER, ESQ.
                    Bieser, Greer & Landis
                    6 North Main Street
                    400 National City Center
                    Dayton, OH  45402

Also Present:  William Hitchings, Defendant
Benjamin White, Probation Officer

Courtroom Deputy:  Elizabeth Penski

Stenographer:      Mary Schweinhagen, RPR, RMR, RDR, CRR
                   United States District Court
                   200 West Second Street, Room 910
                   Dayton, Ohio 45402

     Proceedings reported by mechanical stenography,
transcript produced by computer.

*** *** *** ***

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

P-R-O-C-E-E-D-I-N-G-S                              1:50 P.M.

THE COURT:  We're before the Court this morning in the matter of the United States of America versus William Sidney Hitchings.  This is Case Number 3-21-cr-61, and we're here for the purposes of sentencing and disposition.

Counsel enter their appearance, please.

MS. MAHY:  Good afternoon, Your Honor.  Christina Mahy on behalf of the United States.

MR. FLEISHER:  Good afternoon, Your Honor.  Jim Fleisher here on behalf of the defendant, William Sidney Hitchings, V.

THE COURT:  All right.  Previously, on May the 25th of 2021, Mr. Hitchings was charged in a two-count indictment under this docket number, Count 1 charging him with possession of child pornography, a violation of 18, United States Code, 2252(a)(4)(B) and (b)(2); Count 2 alleged that on February the 9th, 2021, in the Southern District of Ohio, Mr. Hitchings, knowing he was an unlawful user of a controlled substance, knowingly possessed a firearm that had been shipped and transported in interstate commerce.  Those were the two original charges.

Subsequently, Mr. Hitchings was evaluated for the purposes of determining competency.  On June the 29th, 2021, Mr. Hitchings was found competent to stand trial.

On July the 27th, 2021, again, Mr. Hitchings was charged

in a five-count superseding indictment charging him with possession of child pornography; drug user in possession of a firearm; two counts of receipt of child pornography; and knowingly transporting a visual depiction using any means or facility of interstate or foreign commerce that had been mailed, shipped, and transported in or affecting interstate or foreign commerce by any means, including the computer, and the production of such visual depictions involved the use of a minor engaged in sexually explicit conduct, and the visual depiction was of such conduct.

Subsequently, then, on July the 11th, 2022, Mr. Hitchings did appear before this Court and entered a plea of guilty to Count 3 of the superseding indictment. That plea was made pursuant to a plea agreement, and within that plea agreement there was an 11(c)(1)(C) provision in which the government and Mr. Hitchings, through counsel, agreed upon an appropriate disposition to propose to the Court.

That provision -- that provision indicated that or proposed a term -- the following term for disposition: a term of imprisonment not to exceed 136 months; a term of supervised release as determined by the Court and subject to all mandatory conditions the Court must impose or to whatever the discretionary conditions the Court elects to impose; assessments pursuant to 18, U.S.C., 2259(a); and any fine that may be rendered or may be imposed as determined by the Court;

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

restitution as determine by the Court pursuant to the agreement. There is, of course, a forfeiture. There are forfeiture counts. And there is, of course, the special assessment of $100 for that count.

The Court accepted the plea pursuant to the plea agreement, made a finding of guilty, and referred the matter to probation for a presentence investigation.

The Court has received the report and its recommendation and stands ready to proceed with disposition. At this time, however, the Court would confirm with counsel that they are in receipt of the report, its recommendation, and that there are no objections now pending.

Counsel?

MS. MAHY: That's correct, Your Honor.

THE COURT: Mr. Fleisher?

MR. FLEISHER: Yes, Your Honor, we have received the final presentence report and recommendations, have reviewed them, and pose no objections to them.

THE COURT: Thank you.

Mr. Hitchings, in imposing a disposition or determining a disposition for an individual, the Court considers factors of sentencing. I think we discussed this when you entered your plea. There are seven of those factors. One of those factors is the guideline range, which is a result of the United States sentencing guideline calculation, which result in an advisory

range of sentence.

There being no objections to the report and recommendation, the Court's going to proceed as follows:

I'm first going to share with you and with the record the Court's findings with regard to the guideline calculation, the offense level computation, the criminal history calculation, as well as the parameters of sentencing, which are prescribed by the statute that governs this violation, as well as, as a result of the Court's calculation.

Once I'm done sharing those things with the record, I will then afford an opportunity for counsel for both the government and Mr. Fleisher on your behalf to make any further presentation, make any further argument with regard to disposition or mitigation of disposition.  Once they're done, then I will afford you, if you so desire, an opportunity to address the Court on your disposition.

Do you understand how I'm going to proceed?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, as part of that, I had indicated I will listen to the presentations of counsel.  However, counsel has, both counsel, counsel for the government and Mr. Fleisher on your behalf, have submitted memoranda, accompanying documentation, which the Court has, in addition to the presentence report and recommendation, the Court has reviewed thoroughly.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

6

So with regard to the guideline calculation, one of the factors of sentencing that the Court will be using in coming up with a disposition that meets the goals of sentencing but not more than necessary, the Court is, without objection, adopting the guideline calculation that's contained within the report and recommendation, and does so pursuant to the Supreme Court cases of *Booker* and *Fanfan*, as well as utilizing the 2021 edition of the guidelines manual.

Specifically, the Court does make the following findings: The Court finds that the applicable guideline for your violation, a violation of 18, United States Code, 2252 is found in Guideline 2G2.2. That's the guideline for receiving, tampering, or -- I'm sorry -- receiving, transporting, or possessing material involving the sexual exploitation of a minor.

Now, pursuant to Guideline 2G2.2(a)(2), the base offense level shall be 22 as the defendant was convicted under 18, U.S.C., 2252(a)(2). So, therefore, your base offense level will be a 22.

Now, the Court, however, finds, as recommended, that there are a number of specific offense characteristics that do apply. First, the Court finds that pursuant to Guideline 2G2.2(b)(2), if the material involved a prepubescent minor or a minor who had not attained the age of 12 years, the offense level shall be increased by 2.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

The Court finds that you did possess image and video files depicting toddlers and prepubescent minors.  So, therefore, that 2-level increase is warranted.

The Court also finds that, pursuant to Guideline 2G2.2(b)(3)(B), if a defendant distributes in exchange for any valuable consideration but not for pecuniary gain, there is an increase of 5 levels.

Application Note 1 indicates, for the purpose of subsection (b)(3)(B), the "defendant distributed in exchange for any valuable consideration" means the defendant agreed to exchange with another person under which the defendant knowingly distributed to that other person for the specific purpose of obtaining something of value, valuable consideration from that other person, such as other child pornographic material, preferential access to child pornographic materials, or access to a child.

In this case, the Court finds that, Mr. Hitchings, you knowingly engaged in the distribution of image and video files depicting child pornography to others with the expectation of receiving image and/or video files depicting child pornography in return.  Therefore, the 5-level increase is also warranted.

Also, pursuant to Guideline 2G2.2(b)(4)(A), if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, the offense level shall be increased by 4.

The Court finds that you possessed images portraying sadistic conduct. You possessed at least two video files depicting a prepubescent male engaged in anal sexual intercourse with an adult male's penis. This video is considered sadistic, as the insertion of the adult's penis into the victim's anus inflicted pain upon the victim. Additionally, you possessed one image of a prepubescent minor whose legs and arms were bound with black tape. So, therefore, the Court does find that the 4-level increase is appropriate.

Also, under Guideline 2G2.2(b)(6), if the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, there is also an increase of 2 levels.

The Court finds that you did utilize a cellular telephone which was connected to the Internet as defined in 18, U.S.C., 1030(e)(1), and an interactive computer service -- Telegram, Kik, Mega, and Omegle application, as defined in 47, U.S.C., 23 -- I'm sorry -- 230(f)(2) in order to access, receive, and possess child pornography. Therefore, the 2-level increase is appropriate.

Finally, pursuant to Guideline 2G2.2(b)(7)(D), if the offense involved 600 or more images, there is an increase of 5 levels.

According to agents, you were found in possession of at least 94,565 image files and 44,830 video files depicting child pornography. Application Note 6(B)(ii) indicates each video, video clip, movie, or similar visual depiction shall be considered to have 75 images. Therefore, the video files possessed by you equates to at least 3,362,250 images of child pornography. When added to the 94,565 image files that you possessed, you possessed at least 3,456,815 images of child pornography. Therefore, the Court finds that the offense involved more than the 600 images of child pornography, and the 5-level increase applies.

That results in an adjusted offense level of 40.

The Court does find that Mr. Hitchings has demonstrated an acceptance of responsibility for the offense and did agree to -- or did timely notify the authorities of his intention to plead.

So under 3E1.1(a) and (b), he's entitled to a 3-level reduction in the adjusted offense level of 40, bringing his final and total offense level to a 37.

In addition to the offense calculation, the Court has also reviewed Mr. Hitchings's criminal history. He has no -- well, he has criminal history point 1 -- he has 1 criminal history point. Under the guidelines, a criminal history score of 0 or 1 establishes a criminal history category of I.

Having made those findings, the following parameters are

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

10

the parameters within which the Court will be considering Mr. Hitchings's disposition:

The minimum term of imprisonment under the statute for this offense is five years, or 60 months. The maximum term of imprisonment is 20 years.

Under the guidelines, based upon the offense level which the Court has found to be 37 and the criminal history category of I, the guideline imprisonment range is 210 to 262 months. Pursuant to Zone D of the sentencing table -- well, I'm sorry. The guideline imprisonment range, because of the statutory max, is limited at 240 months. So the guideline range would be 210 to 240 months. That's in Zone D, sentencing -- the minimum term shall be satisfied by a sentence of imprisonment.

After any term of incarceration, there would be a term of supervised release. Under the statute, that would be at least five years, could be up to life. Under the guidelines, the length of term of supervised release shall not be less than the minimum term of years specified for the offense, five years, under subdivisions (a)(1) through (a)(3), and may be up to life.

Mr. Hitchings is ineligible under both the statute and the guidelines for probation consideration.

If the Court elects to impose a fine, the Court could fine Mr. Hitchings under the statute up to $250,000. If a fine were to be imposed under the guidelines, the guidelines

would recommend a fine within the range of 40,000 to $250,000.

Under both the statute and the guidelines, restitution is mandatory, which I note, I do believe I have before me an agreed order between Mr. Hitchings and the government.

So, Mr. Hitchings, those are the parameters within which the Court will be considering the other factors of sentencing, considering what would be a disposition that meets the goals of sentencing but not more than is necessary.

Now, as we previously indicated, your plea was made pursuant to a plea agreement which contained an 11(c)(1)(C). That 11(c)(1)(C) is up to 136 months. So anything within that range, from up to -- not more than 136 months. So that is the disposition that I am -- that's the disposition that I am looking at in considering all the factors of sentencing and utilizing the factors of sentencing to determine where within those parameters, if I accept the agreement, I find that the appropriate disposition, a disposition that meets the goals of sentencing but not more than necessary.

So having said that, the Court will afford an opportunity for counsel to make any further presentation to supplement their sentencing memoranda. We'll start with counsel for the government.

MS. MAHY: Thank you, Your Honor.

Your Honor, the government is respectfully requesting a sentence of 136 months of incarceration.

I'd like to begin by talking about the guidelines. There's a lot of discussion in Mr. Hitchings's submissions about, you know, these guidelines enhancements, that they blow up the sentence by, you know, such and such a percentage. And I agree that sentencing is not just a mathematical issue. It's not just we put the numbers into a formula and we come up with a sentence.

The guidelines enhancements are designed to distinguish between offenders, and that's what they are doing in this case. Mr. Hitchings is very different from a defendant who possessed a handful of images. Mr. Hitchings, as the Court knows, possessed roughly 100,000 images. He possessed over 44,000 videos. He should be dealt with differently than someone who possessed a small quantity. He should also be dealt with differently than someone who possessed merely images of lascivious exhibitions. He possessed some of the worst images that exist. He possessed images showing urination on a child, showing acts of degradation and bondage towards children, showing rape of children wearing diapers, they are so young. That should be dealt with differently than less severe images.

And so this discussion of the guidelines, those enhancements are meant to treat Mr. Hitchings as an individual and treat his conduct as individualized conduct, and I think that's what happens here.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

Additionally, I would note that his guidelines are actually 210 to 240 months. The government is only asking for 136 months. So we've already cut him down by 100 months. We've already considered, in fashioning this plea agreement, the unique circumstances of Mr. Hitchings, his life, his personal characteristics, and the nature of his offense. So I don't believe that what the government is asking for is greater than necessary.

Mr. Hitchings throughout the pendency of this case has blamed his offense on his use and his addiction to methamphetamine. He states that methamphetamine is the core cause of his offense. The government disagrees. Methamphetamine does cause hypersexualization, but there is no evidence that I'm aware of that methamphetamine causes sexual attraction of children, that it causes someone to commit child pornography offenses. This Court has seen I don't know how many drug crimes, has seen I don't know how many defendants who have substance abuse problems. And the vast majority of them do not commit the kind of offense that Mr. Hitchings committed. This idea that it was meth who -- who committed this crime rather than William Hitchings is not accurate.

The real question we're trying to answer in fashioning a sentence for Mr. Hitchings is what is he going to do when he gets out of prison? He's obviously going to prison for some term, but when he gets out, what is he going to do? Is he

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

going to get clean, stay clean?  Is he going to do this again?  Or is he going to be rehabilitated?

And so what we need to ask ourselves is does Mr. Hitchings actually understand the wrongfulness of what he did, and does he have remorse for it?  Does he understand that what he did is wrong not just because of some arbitrary rules that society has imposed, but because it harms children?  The evidence suggests that Mr. Hitchings does not understand that.

If we look at his interview, he makes repeated statements about how the law is persecuting him, about how he did not think he was harming anyone by viewing child pornography.  He talks about how he's asked if it's okay for an adult to have a sexual relationship with a consenting eight-year-old, and he responded that it was not his job to determine this, and that that would be a matter that should be decided between the eight-year-old and the other party.

Admittedly, during that interview, Mr. Hitchings was still suffering from a methamphetamine addiction, but he makes statements over and over again that he's just got this abhorrent sexual interest that society has decided is unacceptable, that society and the law are persecuting him.

And it appears Mr. Hitchings continues to hold that belief.  And I say that because of the comments that he made in his interview with Dr. Bresler.  Dr. Bresler's report, which was attached to defendant's sentencing memorandum,

states on page 4, quote, "Mr. Hitchings claimed that meth was entirely to blame for his legal troubles," close quote.

Mr. Hitchings made several sarcastic, unapologetic comments about his role in the instant offenses.  For example, he joked that he offended that poor mouse, in his keyboards, in reference to clicking on child pornography images.

He added, "At the risk of not sounding remorseful enough, I'd be out in two years in the UK."  He later clarified that he recognized that his crimes are not victimless, but he qualified there is a degree of absurdity to it, i.e., downloading child pornography, because it was so easy for him to download.  That's on page 7 of Dr. Bresler's report.

Dr. Bresler interviewed Mr. Hitchings on February 11th of 2022, a year after Mr. Hitchings was arrested.  So Mr. Hitchings had been sitting in jail and he had been, presumably been off of meth and sober for a year when he made those statements that meth was entirely to blame for his legal troubles, and that, you know, his ideas about whether there were victims to his crimes.

Mr. Hitchings did more than possess child pornography. He downloaded it, he traded it with others, and he distributed it.  He gave one man an entire hard drive full of child pornography.  He introduced child pornography to one of his romantic partners, Westendorf.  The two of them would watch child pornography together.  Both of them admitted to that.

But even if we just look at his possession, possession alone is a serious crime; and it's not just a serious crime because of some societal prudishness or some arbitrary judgment, it is a serious crime because it harms its child victims. And the defendant does not need to take my word for that.

Some of the images he looked at belonged to known series, and those victims submitted victim impact statements. The victim April, from the "Aprilblonde" series, wrote, in relevant part, "As a victim, it is my right to be notified each time an image of my abuse is viewed. My mom received 22,000 notifications, and I had to stop the notifications because it made me have panic attacks. It also makes me feel weird, uncomfortable, anxious, and sad. It's hard to imagine 22,000 people have seen or shared images of my abuse. It makes me sick to think about how many people there are in the world who don't care about supporting child abuse. As a child, I didn't have a choice what happened to me. Now I have to suffer twice: The first time was being abused, and the second time is the ongoing anxiety due to the images of my abuse forever accessible. These images will live on the Internet longer than I will live."

The victim in the "Marineland1" series wrote, "I am afraid that someone from the police will call and tell me they found more pictures of me on other people's computers. Every-

time someone else sees pictures or videos of me, it feels like they are the ones who hurt me to begin with.  It feels like they are the ones who did this to me, like they are my abuser and they just want to use me for their own pleasure.  It is like I am just here for other people's pleasure and I am not a person myself with my own wants or needs.  Anyone who looks is keeping my pain going for the rest of my life.  I cry at night because of this."

So John Doe V from the "8 kids" series wrote, "These pictures were spread all over the world through the Internet. Other men are looking at pictures of me being abused as a kid. It makes me feel terrible when I think about it.  I get sick thinking about what they do to themselves when they are looking at pictures of me being abused.  I often like to hide under my covers and play video games to escape from my world. I do not want anyone to see me.  I am scared that someone I know will see these pictures.  I get angry and freak out if I think about it too much.  I try to push these thoughts out of my head, but it is hard.  I don't think about the future.  I don't see myself being anything.  I think about killing myself.  I don't like to be out in public with other people, so I mostly stay alone."

His mother submitted a victim impact statement where she describes the images of her children.  She goes on to say, "The children were small, and the man was big.  The photos are

shocking and horrific. Every single one of these photographs invokes a memory of what never should have been, permanent reminders of perverted sexual victimization. These assaults were so horrendous and terrible. I had hoped and prayed that our boys would never have to relive these nightmares again. Unfortunately, I was wrong.

"In days gone by, photographs such as these would be destroyed, burned into ash. My children's memories of the horrors visited upon them could dim over time and healing could truly take place. With people such as this defendant actively seeking, purchasing, collecting, trading, and gratifying themselves with these horrific depictions of child rape, memories of these events are kept alive and nourished by his vile sickness of human spirit. A victimless crime, hardly."

This is the last one. Victim "P" of the "Sweet White Sugar" series. Her mother submitted a victim impact statement. And she wrote, "At times my child is full of anxiety and does not know how to express it. Sometimes she just tries to bury it. But she is -- but she is not able to keep it buried, and it re-emerges in unexpected and unpredictable ways, often anger, but also sadness. She is embarrassed and humiliated.

"My joy of parenting has been paralyzed. When I became a mom, never did I once think that my child would become a

victim of sexual exploitation: abused and molested over and over again through online child pornography, sexual predators watching my little girl being coerced into performing degrading acts of cruel and violent abuse, my child's body being violated as incessantly.

"She is my baby. Her well-being and my job -- her well-being and my job to protect her is my concern. How is she protected from individuals such as this person?

"My older children are appalled to learn that these videos are in circulation. One of my children said to me, 'But, Mom, they can be removed forever, right?' How do I reply to a question like that?

"As the parent, I tried try to be strong, but I feel very weak. I am overcome with grief. I feel dead. I myself have been diagnosed with posttraumatic stress disorder."

Speaking about her child, she writes, "Her little body is supposed to be her most valuable possession and not intended to be available for unlimited exposure. She becomes powerless through your actions. I want to know how many times you indulged in watching my child be abused. How many other people did you share your abuse with? I want to make it clear to you that my child is not a sexual object or your toy. This child is my pride and joy. I love her more than anything in the world. Being a mom is all I have ever dreamed of. What I didn't ever dream of is her life being crushed by this

horrendous crime.

"I'm dealing with a little girl who talks daily about not wanting to exist anymore, a little girl whose pain is so great and who feels so helpless and angry that she talks openly about wanting to kill herself. She has become more depressed and anxious as she is maturing and growing and as she understands to a greater depth the ongoing crimes committed against her. She is easily overwhelmed by her emotions, and her counselor is very worried and concerned about her talks of suicide."

Mr. Hitchings looked at child pornography because he enjoyed it. But that enjoyment comes at a cost. Mr. Hitchings will have to decide if his enjoyment is worth that cost. And when I say "that cost," I don't just mean the cost to him, the cost of legal trouble, of getting caught, of, you know, trouble to his own life, but the cost of these children being treated like nothing more than objects; these children being emotionally crippled, having difficulty holding down jobs, making friends, forming relationships; these children talking about wanting to kill themselves.

Mr. Hitchings will have to decide if the harm caused to these children is worth it to him, worth the enjoyment he gets out of looking at these images.

Thank you.

THE COURT: Counsel, let me ask a question here.

I've got a calculation that was recommended which the Court has adopted.  You've discussed -- you indicated 100,000 images.  Is that your number?

MS. MAHY:  I'm sorry, Your Honor.  I was rounding. It's 94,565 images.  I think I said almost 100,000.

THE COURT:  And then so that doesn't count the images with regard to the videos?

MS. MAHY:  Right.  It's 94,565 still images, photographs, and 44,830 videos.

THE COURT:  All right.

MS. MAHY:  Which I believe is what's in the PSR.

THE COURT:  Okay.

MS. MAHY:  Thank you, Your Honor.

THE COURT:  Mr. Fleisher.

MR. FLEISHER:  Thank you, Your Honor.

Mr. Hitchings, Your Honor, was arrested in this matter on February 9 of 2021.  And I was shortly thereafter appointed to represent him.  I went to meet him, and the concern at that time, Your Honor, for both counsel and for the Court was his extreme mental distress.  The Will Hitchings that I saw when this case began was recovering from -- well, was in the beginning throes of withdrawal from a methamphetamine addiction that had been going on for six years on a daily basis.  It was an extreme addiction.

At that time, Your Honor, he had been interviewed by FBI

Agent Kinzig and another individual. I know the Court may recall reviewing that video of those statements. Mr. Hitchings's mental state was obviously not good: banging his head on the table, indicating he wanted to harm himself, somewhat psychotic or delusional. And the one thing that did occur in that interview, though, Your Honor, is that he admitted what he did.

He was -- shortly after that, the Court may recall, he was sent for a mental health evaluation, a competency evaluation at FTC SeaTac out west. He underwent that. And when he returned, he was no longer on the psychotropic medications. I think that the period of time that had passed had allowed his body and his mind to get through the withdrawal. And the Mr. Hitchings that came back was significantly different than the one who had left, in my estimation.

I've met with him dozens of times over the course of this case. I did have a typo in my sentencing memorandum. I indicated that he's been in pretrial incarceration for 48 months. That's 24 months, roughly. But over that two-year period, I have seen an evolution in Mr. Hitchings that I think demonstrates that a -- that he's a different person when he's in the throes of this methamphetamine use. Dr. Bresler, and I think the folks at SeaTac, both indicated that he has severe methamphetamine abuse disorder.

And as the case has progressed, Your Honor, I think his level of insight into the nature of the harm that he caused is growing.  It has developed.

THE COURT:  Dr. Bresler's evaluation was in what year?

MR. FLEISHER:  It was in 2022, Your Honor.

THE COURT:  2022.

MR. FLEISHER:  My -- many years ago, I had a partner in my law firm -- I wasn't a partner at the time -- but he was an older gentleman and had actually recalled when there weren't offenses, there weren't federal crimes for the viewing of child pornography.  Not that it wasn't immoral and wrong, but he questioned -- he said something along the lines of, I've never understood how looking at something can be a crime.

And that resonated with me for a moment because one wonders.  But over the course of time, I think Ms. Mahy's arguments have proven to be valid ones.  We heard from statements from some of the victims of these offenses, and there is a harm done, and it's clearly illegal -- no one's disputing that.  Even to possess and view these images, and to rationalize it and say, well, it's not wrong because I didn't commit a contact offense or I would never harm, actually harm a child ignores the fact that you are perpetrating these offenses by serving as the demand for that type of material.

But we would submit to the Court that there is still a

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

distinction and degree between offenders that have come to this Court as contact offenders, persons who have physically or mentally abused children, and those who have not.  They are both wrong.  They are both illegal.  They both require court intervention and punishment.  They both require sentences of imprisonment.  But there is still a distinction.

And so my partner wasn't a hundred percent right at the time, but we would submit to the Court that in its sentencing in this case, what the Court did not hear was the government say that Mr. Hitchings had had a prior sex offense, that he had ever contacted or had contact with any child or attempted to personally physically abuse or sexually abuse any child.

This case is a receipt case.  It is a possession case. It is a serious case.  It's a serious offense.  And it requires a sentence of imprisonment.  We've asked the Court or suggested to the Court that a minimally sufficient sentence in this case would be a term of 72 months.  But regardless, it does require a form of incarceration for some period of time in order for Mr. Hitchings to continue in the process of realization of the significance of this, to remain in a position where he is not exposed to substances, and to work toward his rehabilitation, which I'm confident will occur.

One of the reasons is because he has a very strong and supportive family and friend structure.  I think the Court reviewed all the various letters that came in.  There were a

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

significant number of them. His parents are here from Philadelphia. They support Will. They recognize that what Will did was very wrong. They do not rationalize or justify his behavior. And when Will is released that day, when that day comes, he will have a good start in ensuring that he is not abusing substances.

He's a smart person. He'll be able to find employment, I am certain of it. And he will, I believe, Your Honor, not be back in this situation because, one, he recognizes that it's wrong; two, as he's reported to Dr. Bresler and as Dr. Bresler said, there is data and there is -- and there are studies that demonstrate that there is a connection between methamphetamine use, hypersexuality, and sexually addictive behavior and the use of pornography.

THE COURT: Do you distinguish between possession and distribution?

MR. FLEISHER: Your Honor, I think that's a good question. That's one point I wanted to touch on about the guidelines. I think the government had mentioned that the guidelines seek to individualize these cases; that there are cases where there is simple possession, there are cases where there is receipt, there are cases of distribution, and then there are cases of production, and those guidelines tend to individualize sentences based on the nature of the harm that has been perpetrated. In other words, production, actual

creating of these videos and images, is -- would be viewed more differently than it would be a simple possession case.

I don't know that that's correct. One of the reasons I think the guidelines are less reliable in these cases, in child pornography cases and terrorism cases, really, are the two types of cases where the guidelines seem to fail to distinguish, in other words, how many cases come before this court or any court in this district for child pornography where a computer was not involved. I would suspect there are very few in which there are fewer than 600 images that are possessed. The guidelines tend to lump everyone together and typically end up in ranges that are at or near the statutory maximum, sometimes above the statutory maximum.

THE COURT: But I'm considering a disposition that is significantly off the guidelines.

MR. FLEISHER: I understand, Your Honor. And I think that's been done in other cases. I cited in the sentencing memorandum a number of cases that were actually before this Court. One of them -- the government rebutted or attempted to rebut or distinguish those cases in their sentencing memorandum. One of them that was not discussed by the government was *United States versus Musgrave*, and Mr. Musgrave did receive a sentence of ten years. That was, I believe, a 2019 case, if I'm correct. But Mr. Musgrave had a prior contact sexual offense himself, where he had, I believe,

raped a child in Florida. So he was a two-time offender back in front of this Court for possession of child pornography.

THE COURT: Do you remember whether it was just possession or was he charged with -- was he alleged possession and distribution? Do you know? Do you remember that?

MR. FLEISHER: Your Honor, I do not, but I think I can -- hopefully, I can answer that question. He was a possession case. He was not a receipt case, it appears. He was a registered sex offender, previously convicted. I do not -- I do not have the answer for you. Maybe the Court recalls whether or not --

THE COURT: There are so many moving parts in this calculation.

MR. FLEISHER: There are, Your Honor. I understand that. One of those moving parts, as I understand the government's argument, is the number of images here. And I would submit that Mr. Hitchings's methamphetamine addiction played some part in that. He became hypersexualized. He became in need of more and more stimulation because of this methamphetamine use, and I believe that drove the -- the numbers here in terms of the sheer amount of material that he came to possess. He possessed so much that I very much doubt that he viewed -- could have viewed all of it or that he did view all of it.

And at some point, Your Honor, I think that it's more

28

important not to count the number of images but to look at the nature of the collecting. I will admit that it appears that Mr. Hitchings's collection occurred over a number of years, although those years are years he was using methamphetamine.

There is another case that this Court encountered in 2008, *United States versus Reinhold, Robert Reinhold*. He was a pediatrician in this district. And the reason I cite that case, Dr. Reinhold received a sentencing of five years from the Court. That was also a possession case, not receipt, not distribution, not production.

But Dr. Reinhold possessed tens and tens of thousands of images and videos. So he was described in that case by the government as a collector. I think that that's probably a reasonable characterization in this case. But the number of images in our estimation shouldn't necessarily correlate to the length of the sentence. I think the Court is right in probably giving some extra consideration to the fact that Mr. Hitchings collected this and it wasn't a dabbling in it, I think as the government said. So we will acknowledge that.

Just a few more comments, Your Honor.

THE COURT: Go on.

MR. FLEISHER: The last issue, Your Honor, is the acceptance of responsibility and remorse. I think it's fair to say that when I met Mr. Hitchings two years ago, roughly, there was no recognition of remorse, there was no recognition

that what he had did was wrong.  I think in his interview with Agent Kinzig he -- he was very defensive and made comments that would make one think that he didn't think that he had done anything wrong and maybe the police had done something wrong for coming in.  He was more concerned about himself and the effect that he had had on his own life and his own circumstances.  He was suicidal.  He was recovering.  You know, he was still on methamphetamine at the time of the interview.

The William Hitchings that has evolved today, Your Honor, is a different individual, and I think the Court will hear from him with respect to his position at this point on the nature of what he did and his recognition of why he did it and why he doesn't believe that he will do it again.  He's very firmly of the mind that before his severe addiction to methamphetamine, but for that addiction, he would not have committed this crime.

His criminal record tends to show that he is not a young man -- well, young by my standards -- but he's been around a while, and he hasn't been involved in any kind of acts of violence or sexual offenses or any other significant offenses. He does have the one criminal history point.  And as I pointed out to the Court in that -- in the sentencing memorandum, he was pulled over at a traffic stop, was cooperative with the police, had a concealed carry permit because he qualified for

that, notified the officer that he had the gun, and it was -- it was -- the offense occurred.

So I believe, Your Honor, that Mr. Hitchings does have remorse, has developed some better understanding of the nature of the harm that he committed. He's no longer using. The fact that he never touched a child or would touch a child is justification for the offense he committed. And he is learning, as I learned over time when I heard that statement from my old partner, that this offense is a harm-creating offense and he played some role in it, a very significant role.

THE COURT: All right. Thank you.

Mr. Hitchings, it's come to a point in time where, if you so desire, you can be afforded an opportunity to address the Court with regard to your disposition, mitigation of your disposition, any of these factors of sentencing that you've heard counsel talk about or that I've indicated are the things that I think about in coming up with an appropriate disposition in determining what the Court should impose. So if you would like to do so, I'm going to ask you and Mr. Fleisher to approach the podium.

You may proceed.

THE DEFENDANT: Your Honor, I want to apologize for my actions that led me here today. When I was arrested, I knew I had done something illegal but rationalized it by

suggesting that the real criminals were the ones that touch children, something I myself would never do. I viewed my crime being hands-off, as not necessarily being exploitative, but I now know that I crossed a red line that exists for a very important reason.

The harm I've inflicted has been to create further demand for illicit materials at the expense of innocent people. These victims are deprived of the ability to chose the direction of their lives and, as a result, struggle with chaos and mental disorder. As someone who's experienced depression, I wouldn't want to wish this challenge on anyone else or cause pain, and as such, it surprises me that I defiled my own basic values like kindness and empathy and that I have selfishly contributed to a cruel industry.

While there are zero excuses for my behavior, I believe there has been a strong correlation between my substance abuse and pursuing pornographic materials. While pornography may have been about children, I have no desire to be around children. I can't explain why such perverse content occurs alongside psychostimulant drugs, but I know that maintaining sobriety is a top priority. I've been sober for over two years now, somewhat of a silver lining to incarceration. I found I can have healthy relationships and enjoy much more normal thinking. With this kind of improvement, I hope that my dark behavior can be a thing of the past.

While incarcerated, I will continue to pursue the means to maintain sobriety, because I am confident it will set the groundwork for success. I will also seek therapy to address the underlying behavior of accessing exploitative content. Whatever the courses or programs offered for this treatment, I'll enlist.

I think my time would be well spent tutoring or teaching other inmates, but regardless of what opportunities are available, I'll commit to something constructive that affects others positively as a way to offset some of the harm I have put into the world.

I'd like to apologize to both Prosecutor Mahy and SCIC Kinzig. I'm sorry to be the cause that subjected them to be exposed to this material. I am absolutely ashamed that this is the version of me that they are familiar with.

I am so very sorry to my family: Mom, Dad, Ryan, and Chris and Tony. I should be there with you. I should have made better choices. I never should have ended up here. And it breaks my heart that I can't be there for good things, and it scares me to tears to think that I might not be there when things go bad. Thank you for the unrelenting support. I'm lucky to have the family I do. And I will work to get home and never jeopardize our life again.

I can't stress enough in this statement, but I never intended to harm anyone. I have no doubt of the reach and the

capability of law enforcement, and absolutely understand -- an absolute understanding of the infraction necessitating my exposure to it. Not one moment, not one message as to the importance of law has been missed on me. My actions have had enormous consequences, enough that I don't need to be told twice what I stand to lose if I offend again. I only ask to be afforded the nearest opportunity to show my resolve.

THE COURT: Mr. Hitchings, thank you. Let me ask something here. We've talked -- we've talked, counsel and I have talked about other cases that I have dealt with and things. Now, the usual type -- this type of a case, usually I have a defendant in front of me, more likely than not, that has a criminal history of I.

The first thing I hear is this person's never been in trouble. That's the first thing I hear. The second thing I hear is that it was just, for some reason, you got into it. You're saying the meth, I guess?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Can you explain that a little bit more to me?

THE DEFENDANT: I --

THE COURT: Is it this heightened sexual whatever?

THE DEFENDANT: It is. It's -- just seems like nothing satisfies it on methamphetamine. It's also pursuing something that's more explicit or more taboo, and I don't -- I

don't know where it comes from. I just know that that and collecting is -- it seems to satisfy it.

THE COURT: So the collecting was, that was where you traded?

THE DEFENDANT: Collecting is, it's -- the acquisition of it becomes almost an obsession.

THE COURT: Well, I mean, you're sending it out and getting it back, right?

THE DEFENDANT: Typically, no. I would just go into places where they were posting links and accessing them directly. I didn't trade off things.

THE COURT: So you didn't ever trade any off?

THE DEFENDANT: The only occurrence that I can recall is with the hard drive to --

THE COURT: Well, that was a pretty good size hard drive, wasn't it?

THE DEFENDANT: I don't recall the size of it, but it had a substantial content on it, yes.

THE COURT: What I'm trying to determine here, Mr. Hitchings, and I have no reason to believe -- you have probably one of the best attorneys in this area right beside you right now. And I have no reason to necessarily disbelieve what he believes that you have demonstrated over the last two years. I understand that. But I have a duty to -- I do have a duty to protect the public. I do have a duty to not allow

this type of activity to happen.

Now, you have, for lack of a better term, I guess, dried out here for two years. And so what you're saying is that you believe that that was totally the reason you did this?

THE DEFENDANT: I do.

THE COURT: And it was totally the reason that you exchanged these -- these images?

THE DEFENDANT: It was with another methamphetamine user. It was sort of the -- the thing that happened. It seems to be all over the place. It's a pretty insidious struggle.

THE COURT: Okay. Anything else?

THE DEFENDANT: No, sir.

THE COURT: Well, Mr. Hitchings, in coming up with a disposition, specifically in your case to determine whether or not to accept the 11(c)(1)(C) which recommends a sentence of somewhere up to 136 months, is a sentence that does meet the goals of sentencing but not more than necessary. So I need to look at a number of different things. And we talked about these when you entered your plea.

So the first thing I look at is the nature and circumstance of the offense. I think we kind of -- we kind of beat that to death. This is a serious offense. This is probably one of the more -- more serious offenses this Court deals with. And believe it or not, there are victims; there

are victims. Hundreds and hundreds of victims. So it's serious. So when I look at the nature and circumstance of this offense, there's no doubt that this is -- this is serious. This is a very serious offense. But I need a clear picture.

Now, obviously, the one thing that goes in your favor is the fact that you have no criminal history. However, I've also indicated to you that most of the cases that come in front of me on these cases, there is no criminal history. None.

So I have that dilemma, but so what I do is I need to then determine what kind of sentences are available to me. If I accept the 11(c)(1)(C) here, I have a sentence of anywhere up to 136 months. So what is a sufficient sentence within those parameters if I can accept it? What is a sentence that's going to deter you from doing this again? Now, you're saying that's not a problem. Sometimes when someone has a problem, they're going to be dealing with that problem forever. But how do I deter that person from committing another offense or committing -- violating the law, and how do I protect the public? And obviously, that's my major, major concern.

Now, when I determine -- when I look at the types of sentences available, then I do look -- and Mr. Fleisher's brought up a number of cases that I'm not quite sure I

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

remember them all, but I've been here for a long time. But he brought up the *Musgrave* case. And in that case, my memory does serve me that there was 208 file images and six video files. Now, when I look at your case, I look at 94,565 image files, and I look at 44,830 videos. That garners a 120-month sentence.

Now, I'm sure that Mr. Fleisher probably knows other cases where I may have sentenced differently. Those cases may have been based upon other 11(c)(1)(C)s that were agreed to between defendants and the government for different reasons. But I do tend to agree with Mr. Fleisher to some extent. You know, at some point in time, you don't let the number drive you. You just don't let the number drive you.

I'm more concerned about the fact that -- I guess I kind of understand why you're saying that this heightens your -- I guess the methamphetamine may be some type of a cause for it, but I can't -- I'm having a hard time with not only the fact that you are collecting, I'm having a hard time that you are exchanging or you went out seeking it. There's just -- the comparison with what I am usually, the other similar situations that I am usually faced with, the magnitude of it is staggering.

So let me ask you this: So, now, what would be -- what would be a disposition that protects the public with you?

THE DEFENDANT: Is this for me to answer?

*Mary A. Schweinhagen, RDR, CRR (937) 512-1604*

THE COURT: Yeah, I want you to answer. I asked you the question.

THE DEFENDANT: Well, I mean, like I said in my statement, I mean, from the moment I was arrested, it occurred to me that something had to change of my behavior, you know, to an extreme degree. And sitting in Butler County for two years, at the cost of losing my relationships and seeing people go on with their lives, it's -- I'm terrified to lose any more of that. And I guess I didn't understand the value of it until I blew it all up.

So I got the message from day one, but I understand that there needs to be some sort of penance for the crime. And it's my opinion that somewhere in the range of six years would probably be reasonable.

THE COURT: All right. Well, what I didn't hear from you, that there is something that, I mean -- it sounds like to me that wouldn't you need some type of treatment? Wouldn't you need some type of support? Wouldn't you need something like that? I mean, basically six years is going to cure the whole thing, right?

THE DEFENDANT: There should be a treatment for a part of the sex offender management program, and RDAP, like I did --

THE COURT: Well, RDAP's a drug program.

THE DEFENDANT: Well, it seems that it would be --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

help support that other issue.  But there are programs and treatments available at some of the federal institutions, and I --

THE COURT:  I know there are.

THE DEFENDANT:  -- I'd get right into them.

THE COURT:  Well, I've looked at the nature and circumstance of the offense, Mr. Hitchings.  It's a horrible offense.  It is.  And I have -- I have come to be convinced that it is probably one of the most -- it affects the most people of any other offense that I deal with.  Now, maybe, you know, we're talking about small kids somewhere or kids that have grown up all over the country.  But, you know, it's devastating; it's horrific.  And then I look at the types of things we are dealing with here, and it just becomes disgusting.

So, you know, the fact that you have not had a criminal history, okay, that doesn't tell the whole story.  This is a hideous offense.  And I guess maybe this meth was somewhat of a cause of this or one of the contributing causes for it, but I've not heard that you didn't know that it was -- you always knew it was wrong, right?

THE DEFENDANT:  I believe so.

THE COURT:  You always knew it was against the law, didn't you?

THE DEFENDANT:  I did.

THE COURT: But you always felt that you weren't really -- I don't know -- what?

THE DEFENDANT: I just always regarded it as pornography. I never -- in my head, I didn't differentiate, and it's the methamphetamine kind of drove it to the point where that sort of extremism was normal.

It certainly isn't my attitude when I'm not using narcotics.

THE COURT: Well, I've listened intently to you. I've listened intently to your counsel. I've read carefully the sentencing memorandums, which includes all the attachments, all the support. You do have -- you have a family that supports you. Hopefully, they will continue to do that. Hopefully, everything that has happened within the last two years you will continue to do.

However, this is a very serious offense, and there is a very serious sanction for that offense, so serious that the guidelines, they are like -- they are like way above what we're talking about here.

So I have looked at the sentences that are available to me. I have considered similarly situated individuals, which I've reviewed and have been pointed out to me by counsel. And I have to determine then what is the sentence that does reflect the seriousness of this offense, promote respect for the law, but also provides you a just punishment, and, more

importantly, deter you from further criminal conduct, as well as protect the public.

I've also considered your need for treatment, correctional treatment, because you definitely need correctional treatment.

So after considering all of those things, considering all the factors of sentencing, Mr. Hitchings, the Court -- it is the Court's judgment that you are hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 120 months.

While incarcerated, it is recommended that you participate in the sex offender treatment and counseling; participate in the substance abuse treatment, including the RDAP program if you're admitted; participate in mental health counseling and vocational service program; and that you be imprisoned as close -- do you want close to Dayton?

MR. FLEISHER: Your Honor, we'd respectfully request that the Court consider a recommendation in Elkton, here in Ohio.

THE COURT: Elkton, all right. I'll recommend it. All I can do is recommend, Mr. Hitchings.

Now, of course, you are also ordered to be given any and all time that you have served. So basically you are two years off of that sentence.

Upon your release from imprisonment, you will serve a

term of life on supervised release.

Within 72 hours of release from imprisonment, you will report to the probation office in the district to which you are released.

While on supervision, you must not commit any federal, state, or local crimes.

You will be prohibited from possessing any firearms, ammunition, destructive devices, dangerous weapons.

You will not unlawfully possess any controlled substances. You will refrain from any unlawful use of controlled substances.

You must submit to one drug test within 15 days of release and then periodically thereafter.

You will cooperate with any collection of DNA that may be requested.

And you must comply with the requirements of the Sex Offender Registration and Notification Act as directed by probation, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or have been convicted of this qualifying offense.

You must comply with the standard conditions of supervision that have been adopted by this Court, as well as the following special conditions:

You will participate in sexual offender treatment program to include sex offender assessment, psychosexual evaluation,

and/or other evaluations needed.

You will follow the rules and regulations of the sex offender treatment program as approved by probation.

You will sign all necessary authorization forms to release confidential information so that the treatment providers, the probation officer, polygraph examiner, and others are allowed to communicate openly about your course of treatment and the progress in treatment.

You will make a copayment for sex offender treatment service not to exceed $25. However, even that amount will be determined by your ability to pay.

I also want you to participate in a program of mental health assessment and/or counseling as directed by probation until such time as you're released from the program by probation. Again, there is a not-to-exceed $25 copayment. Again, the exact amount to be determined by your ability to pay.

You are subject to periodic polygraph examinations at the discretion and direction of probation as a means to ensure that you are in compliance with the requirements of this supervision or treatment. The polygraph testing will be at your expense based upon the probation officer's assessment of your ability to pay.

Your residence and employment shall be preapproved by probation and must be in compliance with state and local law.

You will not view or possess materials, images, videos, or computer files containing sexually explicit conduct as defined in 18, U.S.C., 2256(2)(a) and (b).

You will have no contact with any minors, with the exceptions of -- you have no children, do you?

THE DEFENDANT: No, sir.

THE COURT: You will have no contact with any minors. The term "contact" extends to all form of communication, such as email, telephone, text, letter, and any other form of electronic communication. This provision does not encompass persons under the age of 18, such as ticket vendors, cashiers, or waiters with whom you may deal in the ordinary, normal commercial services.

You will be prohibited from loitering where minors congregate, as such, but not limited to playgrounds, arcades, amusements parks, recreation parks, sport events involving minors, shopping malls, and public swimming pools.

You will submit to the installation of software and to monitor computer activities on any computer that you are authorized to use at your expense. The software will record any and all activities on the computer. The software will be checked on a periodic basis. You have no expectations of privacy regarding the computer use or information stored on the computer, and shall make other users of said computer aware of that monitoring software.

You should understand that any information gathered by said software may be used against you in subsequent court actions regarding your computer use and the conditions of supervision.

You will comply with the rules set forth in the Computer and Internet Monitoring Agreement and the Computer and Internet Acceptable Use Agreement as adopted by this Court.

In consideration of 18, United States Code, 3583(d)(3), you will submit and/or surrender any media device to which you have access or control to a search based on reasonable suspicion of contraband or evidence of a violation of the condition of supervision. A "media device" is defined as, but not limited to, any device which is capable of accessing the Internet, storing images, texts, or other forms of electronic communication.

You will participate in a program of testing, treatment, and/or medication compliance for alcohol and controlled substance abuse as directed by probation until such time as you are released from the program by probation. Again, there is a copay.

You will participate in a vocational service program as directed by probation officer. Such program may include on-the-job training, job readiness training, and skills development training.

I'm not imposing any fine. I don't find you have the

ability to pay a fine.

Now, counsel, before I go any further, the agreed order, does that contain the restitution as contained in the proposed order?

MS. MAHY: Yes, Your Honor.

THE COURT: My understanding is that Mr. Hitchings and the government have entered into an agreed order, ordering restitution to the number of victims in this incident.

Counsel, is there a request that I read that onto the record at this point in time, or is the judgment -- is the agreed order sufficient?

MR. FLEISHER: Your Honor, I believe the agreed order is sufficient for our purposes.

MS. MAHY: I agree, Your Honor.

THE COURT: All right. So the Court is going to order restitution as specified in the agreed order that has been executed by the parties.

Now, while incarcerated, if Mr. Hitchings is working in a non-UNICOR or Grade 5 UNICOR job, he will pay $25 per quarter toward his restitution obligation. And if he is working in a Grade 1 to 4 UNICOR job, he will pay 50 percent of his monthly pay toward the restitution obligation. Any change in this schedule shall be made only by an order of this Court.

Pursuant to 18, U.S.C., 3612(f)(3)(A), the Court waives the requirement of any interest on any balance of the

restitution not paid within 15 days; and in accordance with 18, U.S.C., 3664(m)(1)(A) and 18, U.S.C., 3613(b) and (f), the liability to pay the restitution shall terminate the later of 20 years from the entry of judgment or 20 years after release from imprisonment.

It is ordered that the defendant, Mr. Hitchings, pay the special assessment amount of $100, which is due immediately.

The Court further finds that Mr. Hitchings is indigent and does not have ability to pay the $5,000 special assessment under 18, U.S.C., 3014. Thus, the $5,000 special assessment is not imposed.

The Court further finds that Mr. Hitchings is indigent and does not have the ability to pay the up-to $35,000 special assessment under 18, U.S.C., 2259(a); thus, the $35,000 special assessment is not imposed.

However, pursuant to the superseding indictment and the plea agreement, Mr. Hitchings is ordered to forfeit the ThinkPad laptop base, Serial Number PC-08FCJQ, with the Micro SD SanDisk Ultra 64 GB, Serial Number 2414DGZ470MS; the Motorola MotoZ3 IMEI 3555; the 5009 5208 307 64 gigabyte, 197 gigabyte internal portable; the ONN thumb drive; the One Toshiba disk drive; the Omega Network storage device; the Google home device, Model H1A, with power cord; the WD SATA drive model; the WD SATA drive model, another drive model -- as a matter of fact, there are four of the WD SATA. Serial

numbers are contained in this order for all of these items --
4 thumb drives: one Lexar 32 gigabyte thumb drive, one Lexar
32 gigabyte thumb drive, one red-in-color thumb drive, one
SanDisk Ultra 32 gigabyte thumb drive; Seagate Backup Plus 1
terabyte hard drive with a blue cord; an LG-V521 gold-in-color
with nano SIM and a micro CD card inside; the WD purple hard
drive; the 32-gigabyte Micro SD card Gigastone; the 13 SD card
and 3 SanDisk adapters; the 14 USB drives, the black and blue
Datto Atto; the black Lenovo laptop; the HP Pavilion 21 Smart
Touch all-in-one PC; the 500 gigabyte Western Digital HOD
encrypted model; the Lenovo ThinkPad, Model T480; the Orico
external hard drive enclosure; the Zotac mini PC; two Synology
disk stations; HP computer; Buffalo Terastation; the Hikvision
DS -- whatever that is; the IBM system storage; the HP
Proliant; and the -- there are four HPAJ941A servers; and the
HP Blue Iris server.

Now, I've listed -- those matters that I have ordered
forfeited are contained on page 7 and 8 of the judgment entry
that the Court will be issuing, all which contain the serial
numbers for those individual items.

Mr. Hitchings, do you have any questions?

THE DEFENDANT: No, sir.

THE COURT: Mr. Fleisher?

MR. FLEISHER: No, Your Honor.

THE COURT: Ms. Mahy?

*Mary A. Schweinhagen, RDR, CRR (937) 512-1604*

MS. MAHY: No, Your Honor.

THE COURT: Any objections to the disposition not previously raised?

MS. MAHY: Not from the government.

MR. FLEISHER: No, Your Honor.

THE COURT: Mr. Hitchings, every individual who has a judgment placed upon them has a right to appeal their judgment if they believe the Court has done something wrong, improper, or illegal with regard to their case. That needs to be done within 14 days of their judgment.

If that individual wishes to appeal but cannot afford counsel to pursue an appeal, counsel can be appointed to make sure that the appeal is timely filed and aggressively pursued.

Having said that, under Provision 10 of your plea agreement, in exchange for certain concessions that were made by the government in the plea agreement, you did waive your right to appeal the conviction and sentence imposed except on the grounds as specified in paragraph 9 or if the sentence imposed exceeded the statutory maximum. Now, that waiver does not bar any claim by -- for ineffective assistance or prosecutorial misconduct.

Item 9, which is the one exception that is listed in the waiver, there was a conditional -- this was a conditional plea between the defendant and the government pursuant to Federal Rule of Criminal Procedure 11(a)(2). You pled -- your plea of

guilty was conditional in that the defendant reserves any right he may have to seek appellate review of the district court's order filed on or about March the 14th, 2022 -- that was the Court's ruling on the motion to suppress -- and further briefed in his supplemental memorandum supporting defendant's motion to suppress and defendant's reply -- brief in reply to that response. And that was all filed on February the 18th, 2022.

Of course, if Mr. Hitchings does appeal and he prevails on the appeal, the defendant would be allowed to withdrawal the guilty plea.

Do you understand your rights to appeal and those conditions and exceptions?

THE DEFENDANT: I do.

THE COURT: Do you have any questions about any of that?

THE DEFENDANT: No, sir.

THE COURT: Anything further, Mr. Fleisher?

MR. FLEISHER: No, Your Honor, I don't believe so.

THE COURT: Ms. Mahy?

MS. MAHY: No, Your Honor.

THE COURT: Good luck to you, Mr. Hitchings.

THE COURTROOM DEPUTY: All rise. This court stands in recess.

(Proceedings concluded at 3:19 p.m.)

51

CERTIFICATE OF REPORTER


I, Mary A. Schweinhagen, Federal Official Realtime Court Reporter, in and for the United States District Court for the Southern District of Ohio, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


s/Mary A. Schweinhagen

_____ 23rd of June, 2023

MARY A. SCHWEINHAGEN, RDR, CRR
FEDERAL OFFICIAL COURT REPORTER


*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*